# In re Deon Melvin Orlando Garvin-NOBLE, Respondent

File A41 600 093 - Oakdale

*Decided as amended January 16, 1997[1]*

U.S. Department of Justice
Executive Office for Immigration Review
Board of Immigration Appeals

(1) Bond redeterminations of detained deportable aliens convicted of an aggravated felony are governed by the Transition Period Custody Rules of section 303(b)(3) of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Division C of Pub. L. No. 104-208, 110 Stat. 3009-546, 3009-586 (enacted Sept. 30, 1996)("IIRIRA"), irrespective of how or when the alien came into immigration custody.

(2) Aliens deportable on aggravated felony grounds are eligible for release from immigration custody under the Transition Period Custody Rules, provided the alien can demonstrate that he or she was either lawfully admitted or cannot be removed because the designated country will not accept him or her, will not pose a danger to safety of persons or of property, and will likely appear for any scheduled proceeding.

FOR RESPONDENT: Francois Au, Esquire, New York, New York

AMICUS CURIAE FOR AILA: Marc Van Der Hout, Esquire, San Francisco, California, D.C.[2]

FOR THE IMMIGRATION AND NATURALIZATION SERVICE: Scott M. Rosen, Appellate Counsel

BEFORE: Board En Banc: SCHMIDT, Chairman; DUNNE, Vice Chairman; HEILMAN, HOLMES, HURWITZ, VILLAGELIU, FILPPU, COLE, and MATHON, Board Members. Concurring and Dissenting Opinion: ROSENBERG, Board Member, joined by VACCA, and GUENDELSBERGER, Board Members.

FILPPU, Board Member:

This is a timely appeal from an Immigration Judge's May 31, 1996, bond redetermination decision finding the respondent subject to a then prevailing mandatory detention provision of the Immigration and Nationality Act. The principal question presented in this case is whether the respondent, who was

---

[1] On our own motion, we amend the November 27, 1996, order in this case. The amended order makes editorial changes consistent with designating the case as a precedent. It also expands the statutory analysis, principally in Part IV, and it includes a more comprehensive concurring and dissenting opinion.

[2] This Board acknowledges with appreciation the brief submitted by amicus curiae.

convicted of an aggravated felony, may be released on bond under the Transition Period Custody Rules enacted during the pendency of this appeal by section 303(b)(3) of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Division C of Pub. L. No. 104-208, 110 Stat. 3009-546, 3009-586 (enacted Sept. 30, 1996)("IIRIRA").

We conclude that the Transition Period Custody Rules of the IIRIRA govern the present custody determination of an alien convicted of an aggravated felony, even though his conviction for the underlying aggravated felony, his release from criminal incarceration, and his initial bond determination occurred before these rules became effective. We also conclude that the lawful permanent resident respondent is eligible for release from immigration detention as an aggravated felon under the transition rules, provided he can demonstrate that he will not pose a danger to the safety of other persons or property and is likely to appear for all scheduled proceedings. The record will be remanded to the Immigration Judge for further proceedings.

## I. BACKGROUND

The respondent is a 21-year-old native and citizen of Guyana who came to the United States as a lawful permanent resident in August of 1987 at the age of 11. His family ties to this country include a United States citizen wife and lawful permanent resident parents and sister. On July 1, 1993, he was convicted upon a plea of guilty of criminal sale of a controlled substance (cocaine) in the third degree under New York law. For this conviction, the respondent was sentenced to an indeterminate term of 1 to 3 years' imprisonment.

On February 4, 1994, the respondent was charged with deportability as having been convicted of a controlled substance violation and an aggravated felony under sections 241(a)(2)(B)(i) and (A)(iii) of the Act, 8 U.S.C. §§ 1251(a)(2)(B)(i) and (A)(iii) (1994). The Immigration and Naturalization Service released the respondent from custody in July 1994 on a bond of $8,000 after he was freed from prison on parole. [3] His criminal parole, however,was subsequently rescinded for reasons that are not entirely clear from

---

[3] In July 1994, at the time of the respondent's initial bond determination, the relevant statutory provision governing custody determinations for aggravated felons was section 242(a)(2) of the Act, 8 U.S.C. § 1252(a)(2) (1994). It provided:

(A) The Attorney General shall take into custody any alien convicted of an aggravated felony upon release of the alien (regardless of whether or not such release is on parole, supervised release, or probation, and regardless of the possibility of rearrest or further confinement in respect to the same offense). Notwithstanding paragraph (1) or subsections (c) and (d) but subject to paragraph (B), the Attorney General shall not release such felon from custody.

(B) The Attorney General may not release from custody any lawfully admitted alien who has been convicted of an aggravated felony, either before or after a determination of deportability, unless the alien demonstrates to the satisfaction of the Attorney General that

the record, and his prison sentence was reimposed. In May 1996, the respondent completed his prison sentence and was released again into Service custody. The district director cancelled the respondent's prior bond and determined that he should be detained without bond. The respondent then requested a bond redetermination hearing before an Immigration Judge.

After both the bond redetermination order was entered on May 31, 1996, and the appeal was filed, the Immigration Judge prepared a written memorandum dated June 12, 1996, explaining the denial of the respondent's request for a change in custody status. Agreeing with the district director that the respondent was not eligible for bond, the Immigration Judge held that, due to his drug trafficking conviction, the respondent was subject to the mandatory detention requirement of section 242(a)(2) of the Act, as amended by section 440(c) of the Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-132, 110 Stat. 1214, 1277 (enacted Apr. 24, 1996) ("AEDPA").[4] The Immigration Judge thus concluded that he had no authority under the amended statute to release the respondent from custody. The respondent appealed this decision, contending that the mandatory detention provision was both impermissibly retroactive as applied to him and unconstitutional. The record reflected that the respondent was in Service custody on the date of our original order.

## II.  SECTION 303(b)(3) OF THE IIRIRA: THE TRANSITION PERIOD CUSTODY RULES

On September 30, 1996, the President signed the IIRIRA into law. The provisions of the IIRIRA pertinent to this case concern changes to existing detention rules for criminal aliens in deportation proceedings. Under prior custody law as amended by section 440(c) of the AEDPA in April of 1996, aliens whose criminal offenses were covered in many of the grounds of deportation listed in section 242(a)(2) of the Act could not be released from immigration detention. Section 303(b)(3) of the IIRIRA contains the so-called "Transition Period Custody Rules" ("transition rules") that on October 9, 1996, replaced the amendments made by section 440(c) of the AEDPA. October 9, 1996, was the date the Immigration and Naturalization Service Commissioner, acting on behalf of the Attorney General, notified Congress that such rules were being invoked. *See* IIRIRA § 303(b)(2), 110

___

such alien is not a threat to the community and that the alien is likely to appear before any scheduled hearings.

[4]  Section 242(a)(2) of the Act, as amended by section 440(c) of the AEDPA, read as follows:
The Attorney General shall take into custody any alien convicted of any criminal offense covered in section 241(a)(2)(A)(iii), (B), (C), or (D) of this title, or any offense covered by section 241(a)(2)(A)(ii) for which both predicate offenses are covered by section 241(a)(2)(A)(i) of this title, upon release of the alien from incarceration, shall deport the alien as expeditiously as possible. Notwithstanding paragraph (1) or subsections (c) and (d) of this title, the Attorney General shall not release such felon from custody.

Stat. at 3009-586; *see also* 62 Fed. Reg. 444, 450, (Jan. 3, 1997) (noting invocation of transition rules and proposing regulations on permanent IIRIRA amendments). In contrast to the detention mandate established by the AEDPA in April 1996, the transition rules restore discretionary authority in the Attorney General to release many criminal aliens who are either lawfully admitted to this country or cannot be removed because the designated country will not accept them, provided they can meet statutory conditions substantially similar to the pre-AEDPA tests regarding dangerousness and flight risk. *See generally Matter of Drysdale*, 20 I&N Dec. 815 (BIA 1994).

In enacting the Transition Period Custody Rules, Congress had before it evidence that the Attorney General did not have sufficient resources to carry out the mandatory detention requirement recently implemented in the AEDPA amendments. *See Criminal and Illegal Aliens, 1996: Hearings Before the Subcomm. on Immigration and Claims of the House Comm. on the Judiciary*, 104th Cong. (1996) (statement of David A. Martin, General Counsel, INS)[hereinafter INS General Counsel's statement].  The transition rules were thus designed to give the Attorney General a 1-year grace period, which may be extended for an additional year, during which mandatory detention of criminal aliens would not be the general rule. *See* 142 Cong. Rec. S11,838-01, S11,839, (daily ed. Sept. 30, 1996) (statement of Sen. Hatch). The statute specifically provides that upon their invocation, the transition rules "shall be in effect" for the 1- or 2-year grace period "instead of" either the permanent custody rules set forth in the IIRIRA or the AEDPA amendments. IIRIRA § 303(b)(2).

With this legislative backdrop in mind, we now discuss briefly the statutory language of the Transition Period Custody Rules.

## A.  Section 303(b)(3)(A) of the IIRIRA: Apprehension of Criminal Aliens

The Transition Period Custody Rules are divided into two subparagraphs in section 303(b)(3) of the IIRIRA. Section 303(b)(3)(A) describes the Attorney General's duty to apprehend terrorists and most criminal aliens when released from criminal incarceration and pending proceedings respecting removal from the country. It reads, in pertinent part:

(A) IN GENERAL.  During the period in which this paragraph is in effect . . . , the Attorney General shall take into custody any alien who -

(i)  has been convicted of an aggravated felony  (as defined under section 101(a)(43) of the Immigration and Nationality Act, as amended by section 321 of this division),

(ii)  is inadmissible by reason of having committed any offense covered in section 212(a)(2) of such Act,

(iii) is deportable by reason of having committed an offense covered in section 241(a)(2)(A)(ii), (A)(iii), (B), (C), or (D) of such Act (before redesignation under this subtitle), or

(iv) is inadmissible under section 212(a)(3)(B) of such Act or deportable under section 241(a)(4)(B) of such Act (before redesignation under this subtitle),

when the alien is released, without regard to whether the alien is released on parole, supervised release, or probation, and without regard to whether the alien may be arrested or imprisoned again for the same offense.

Notably, there is an overlap in the categories of aliens covered in subparagraphs (A)(i) and (iii). Subparagraph (A)(iii) lists several deportation grounds, including section 241(a)(2)(A)(iii) of the Act, which makes aliens deportable by virtue of having been convicted of an aggravated felony after entry. But, subparagraph (A)(i) consists of aliens convicted of aggravated felonies. Thus, there is a statutory overlap in subparagraphs (A)(i) and (iii) of aliens convicted of an aggravated felony.

### B. Section 303(b)(3)(B) of the IIRIRA: Bond Provisions

In addition to mandating the apprehension of most criminal aliens, the Transition Period Custody Rules also set forth limiting conditions for the release of some criminal aliens listed in section 303(b)(3)(A). The bond provisions are provided for in subparagraph (B), which reads as follows:

(B) RELEASE. - The Attorney General may release the alien only if the alien is an alien described in subparagraph (A)(ii) or (A)(iii) and -

(i) the alien was lawfully admitted to the United States and satisfies the Attorney General that the alien will not pose a danger to the safety of other persons or of property and is likely to appear for any scheduled proceeding, or

(ii) the alien was not lawfully admitted to the United States, cannot be removed because the designated country of removal will not accept the alien, and satisfies the Attorney General that the alien will not pose a danger to the safety of other persons or of property and is likely to appear for any scheduled proceeding.

IIRIRA § 303(b)(3)(B).

Of importance to this case is the fact that the statutory language permits the discretionary release of aliens described in subparagraphs (A)(ii) and (iii). At the same time, however, it is implicit in the statute that those classes of aliens described in subparagraphs (A)(i) and (iv) are not eligible for release pending deportation. Additionally, the fact that a criminal alien falls within subparagraphs (A)(ii) or (iii) is not alone sufficient to justify releasing the alien. The alien must also demonstrate that he was either lawfully admitted or cannot be removed because the designated country will not accept him, that he will not pose a danger to persons or property, and that he will likely appear at future scheduled proceedings. *See* IIRIRA §§ 303(b)(3)(B)(i), (ii).

Having identified the relevant statutory changes, we now turn to the issues presented in this case and the rules guiding our construction of the new statute.

## III. ISSUES PRESENTED

The issues presented in this case are as follows:

1. Whether the Transition Period Custody Rules govern the present custody determination of a detained deportable alien convicted of an aggravated felony, even though the alien's conviction for the underlying aggravated felony, release from criminal incarceration, and initial bond determination preceded the October 9, 1996, invocation of those rules.

2. If the Transitional Period Custody Rules apply, whether an alien deportable on aggravated felony grounds is barred from release under section 303(b)(3)(B) of the IIRIRA.

In resolving these issues, we are guided by traditional rules of statutory construction. *See INS v. Cardoza-Fonseca*, 480 U.S. 421, 446 (1987). Pursuant to the teachings of the Supreme Court, the first point of inquiry in a statutory analysis is the language employed by Congress, and it is assumed that the legislative purpose is expressed by the ordinary meaning of the words. *Id.* at 431; *INS v. Phinpathya*, 464 U.S. 183, 189 (1984). The language of the statute must ordinarily be regarded as conclusive, absent a clearly expressed legislative intention to the contrary. *Burlington Northern R.R. Co. v. Oklahoma Tax Comm'n*, 481 U.S. 454, 461 (1987).

## IV. IIRIRA'S TRANSITION RULES GOVERN PRESENT CUSTODY DETERMINATIONS OF AGGRAVATED FELONS

We first address the preliminary question of whether the transition rules govern the present custody determination of this respondent, who is deportable on aggravated felony grounds. Both the Service and amici take the position that the custody standards contained in the transition rules apply to the respondent, rather than those imposed by section 440(c) of AEDPA, or the general, noncriminal, bond provisions of section 242(a)(1) of the Act. We agree.

As an administrative agency, we are required to act under the law as it stands when entering our order. *Ziffrin v. United States,* 318 U.S. 73, 78 (1943). We must apply changed law to cases pending before us at the time of enactment, unless, for example, the repealing statute contains a savings clause, or application of changed law would be impermissibly retroactive. *See Landgraf v. USI Film Products*, 511 U.S. 244 (1994) (relating to applying newly enacted statutes to prior conduct or transactions); *Allen v. Grand Central Aircraft Co.*, 347 U.S. 535 (1954) (dealing with savings clause).

### A. Transition Rule Statute Covers Custody Determinations of Detained Criminal Aliens

We read the transition rule statute as covering present custody determinations of at least those detained aliens deportable on one of the grounds listed

in the statute, regardless of how or when the alien came into Service custody.[5] Our reading comports with a "plain meaning" statutory construction and is wholly consistent with congressional intent.

## 1. The Effective Date Provision and "instead of" Directive

Congress evidently preferred mandatory detention pending deportation but understood that detention space and other practical limitations temporarily stood in the way of that preference. Consequently, it gave the Attorney General the option to invoke the transition rules for a 1- or 2-year period during which mandatory detention would not be required, provided she notify congressional committees that the Service lacked the detention space and personnel to carry out the detention mandate of section 440(c) of the AEDPA or new section 236(c) of the Immigration and Nationality Act as enacted by the IIRIRA (to be codified at 8 U.S.C. § 1226(c)).

Section 303(b)(2) of the IIRIRA contains the effective date provision for the transition rules. It states, in pertinent part, that if the Attorney General provides the proper notice to congressional committees, "the provisions in paragraph (3) shall be in effect for a 1-year period beginning on the date of such notification, *instead of*" section 440(c) of AEDPA or new section 236(c) of the Act, after redesignation on April 1, 1997. IIRIRA § 303(b)(2) (emphasis added).[6]

The "instead of" directive renders inoperative for the transition period those custody rules implemented by the AEDPA and legislated in the IIRIRA's permanent rules. The plain language of section 303(b)(2) states that "the *provisions* of [the transition rules] shall be *in effect . . .* , *instead of*" those in the AEDPA or the IIRIRA. (Emphasis added.) It does not state, as

---

[5] We do not purport to answer all questions that may arise under the transition rules. For example, we need not determine here whether the transition rules cover bond redeterminations of aliens who were freed from immigration custody before the transition rules took effect. Additionally, we do not reach questions of Immigration Judge and Board jurisdiction over detention decisions respecting "excludable" or "inadmissible" aliens, or of the interplay between the transition rules and current section 236(e) of the Act, 8 U.S.C. § 1226(e) (1994), governing "aggravated felons" in exclusion proceedings.

[6] Section 303(b)(2) of the IIRIRA reads as follows:

(b) EFFECTIVE DATE

. . .

(2) NOTIFICATION REGARDING CUSTODY - If the Attorney General, not later than 10 days after the date of the enactment of this Act, notifies in writing the Committees on the Judiciary of the House of Representatives and the Senate that there is insufficient detention space and Immigration and Naturalization Service personnel available to carry out section 236(c) of the Immigration and Nationality Act, as amended by subsection (a), or the amendments made by section 440(c) of Public Law 104-132 [AEDPA], the provisions in paragraph (3) shall be in effect for a 1-year period beginning on the date of such notification, instead of such section or such amendments. The Attorney General may extend such 1-year period for an additional year if the Attorney General provides the same notice not later than 10 days before the end of the first 1-year period. After the end of such

implied by the dissent, that the transition rules shall be *applied* to those *persons* subject to the AEDPA, instead of the AEDPA's rules themselves. Section 303(b)(2) specifically makes the transition rules controlling for custody determinations of those aliens covered by the statute rather than the AEDPA's rules and the IIRIRA's permanent rules, including those whose deportation grounds are covered in the transition rules but not in the AEDPA amendments.[7]

The "instead of" language in section 303(b)(2) does, nevertheless, support a construction of the transition rules themselves which would reach aliens previously covered by the AEDPA's mandatory detention requirement. The consistency in the general approach to mandatory detention in both the AEDPA and the IIRIRA, and the specific reference to the relevant provisions of both enactments in section 303(b)(2), strongly suggest that Congress expected AEDPA detainees to be governed by the transition rules "instead of" either the mandatory detention rules of the AEDPA or the general, non-criminal, bond provisions which contain no explicit requirements aimed at protecting the general public from ordinary criminal behavior.

In the end, however, it is the specific language of the transition rules themselves which must govern this question. Section 303(b)(2) has substituted the "provisions" of the transition rules in place of the permanent rules or the AEDPA amendments which otherwise would have applied. The "instead of" language in section 303(b)(2), at most, simply points powerfully toward a construction of the Transition Period Custody Rules in section 303(b)(3) that reaches those criminal aliens who were subject to the AEDPA provisions.

## 2. The Transition Rule Statute's Bond Provisions and the "when released" Clause

The bond provisions are contained in subparagraph (B) of the Transition Period Custody Rules. It states that the "Attorney General may release *the alien* only if the alien is an alien described in paragraph (A)(ii) or (A)(iii)," provided other conditions are satisfied. (Emphasis added.) We understand "the alien" described in the bond provision of subparagraph (B) to be any alien detained by the Service who also comes within one or more of the Roman numeral subdivisions of subparagraph (A). The coverage or scope of subparagraph (B) is not limited to certain aliens by virtue of the date of release from criminal incarceration.[8]

---

1-year or 2-year periods, the provisions of such section 236(c) shall apply to individuals released after such periods.

[7] Given our reading of section 303(b)(2) of the IIRIRA, and our conclusion that the transition rules are in effect instead of section 440(c) of the AEDPA, we need not reach the question of whether the AEDPA's section 440(c) covers only those aliens released from criminal incarceration after April 24, 1996, the effective date of the AEDPA.

[8] If it were, then the transition rules would not extend to the respondent here, as he was released from criminal incarceration before the October 9, 1996, invocation date of those rules.

Subparagraph (A) imposes a duty on the Service to assume the custody of certain criminal aliens and specifies the time at which that duty arises. It directs the Attorney General to take into custody any alien identified in the subparagraphs "when the alien is released" from the incarceration portion of the alien's criminal sentence. *See generally* H.R. Rep. No. 101-681(I), § 1503, at 148 (1990), *reprinted in* 1990 U.S.C.C.A.N. 6472, 6554 (relating to similar language contained in predecessor statute as enacted in the Comprehensive Crime Control Act of 1990). This "timing" language of subparagraph (A), specifically, the "when the alien is released" clause, does not define the category of criminal aliens covered by subparagraph (B). Nor is it intended to specify the triggering date for the application of the new custody standards.

The "when released" clause, instead, modifies the command that the "Attorney General shall take into custody" certain criminal aliens, by specifying that it be done "when the alien is released" from incarceration. It is not a part of the qualities or characteristics of the alien, at least as the sentence is currently composed. There are classes of aliens in subparagraph (A) who, by their very terms, might not ever have been subjected to a criminal conviction and thus would never be "released" from criminal incarceration. Under the dissent's reading of the "when released" clause, specifically that this clause is a modifying phrase which is part of the alien's description, these classes of individuals (such as never convicted terrorists) would not be subject to Service apprehension under subparagraph (A) or the release standards of subparagraph (B). The dissent's reading of the statute would appear to render the inclusion of these categories of aliens in subparagraph (A) mere statutory surplusage.

The dissent notes that the "when released" language of the transition rules is similar to such language in the temporarily superseded permanent provision of new section 236(c) of the Act, as enacted by the IIRIRA. It then argues that this language of the permanent law has a temporal feature in its application to criminal aliens by virtue of the last sentence to section 303(b)(2) of the IIRIRA. This sentence provides that "[a]fter the end of" the transition period, "the provisions of such section 236(c)" of the permanent law "shall apply to individuals released after such periods" as the transition rules may be in effect.

The dissent's assumption is that the phrase "released after such [transition] periods" in this last sentence means "released from criminal incarceration" after such transition period. If the dissent's assumption is correct, then this last sentence would provide some support for its reading of the "when released" language in both the permanent rules and the transition rules, unless the transition rules can be construed to survive beyond the end of the

He is in no material respect different from any alien released prior to October 9, 1996, under our reading of the new statute.

1- or 2-year periods, at least for aliens initially governed by them. But the dissent's assumption would also appear to lead to genuinely anomalous results.

We requested briefing on this issue, but obtained little enlightenment from the parties. It is not essential that we attempt to construe the shift from the transition period to the permanent law at this time. For present purposes it is sufficient to note that we find little guidance from the last sentence of section 303(b)(2) in construing the transition rules themselves. Given the thrust of the AEDPA and IIRIRA enactments respecting criminal aliens, as well as the legislative history, it is incomprehensible that Congress intended for potentially dangerous criminal aliens, in Service custody and awaiting removal, to obtain springing entitlements to favorable release consideration. It is even more anomalous that this springing opportunity would arise because of the expiration of the flexible transition rules and their replacement by the more mandatory detention provisions of the IIRIRA's permanent rules. The incongruous implications of the dissent's position cause us to place little weight on this particular language in construing the transition rules.

## 3. Practical Considerations

Congress has become increasingly concerned over the years about the growing criminal immigrant population in this country as well as the failure to effectuate the removal of many of these aliens. *See, e.g.,* H.R. Rep. No. 104-469(I) (1996), *available in* 1996 WL 168955. These concerns led to the mandatory detention provisions contained in both the AEDPA's provisions and the IIRIRA's permanent provisions. *See, e.g.,* 142 Cong. Rec. S4,730-01, § 164.

While practical constraints temporarily necessitated some flexibility, Congress, in keeping with prior concerns, enacted the transition rules with some restrictions on the release of criminal aliens pending removal, such as keeping those aliens dangerous to the community in detention. It is not apparent why these same concerns would not extend to present custody determinations of aliens released from criminal incarceration prior to the date the transition rules were invoked. Moreover, it would be inconsistent with our understanding of congressional intent to construe the transition rules in a way that permits the release of a subgroup of criminal aliens (based on the wholly fortuitous date of release from incarceration) under a more lenient standard which does not mandate a threshold "threat to the community" determination. *See* section 242(a)(1) of the Act (relating to the general, noncriminal, bond provisions which apparently would be the only available alternative for adjudicating bond determinations).

In contrast, the dissent's reading of the statutory language renders the applicability of the transition rules dependent on a number of fortuitous factors. Custody redeterminations, for example, in the following situations arguably would not be governed by the transition rules, but rather by the general, noncriminal, bond provisions of section 242(a)(1) of the Act: (1) an alien

subject to deportation for having engaged in terrorist activities but who was never "convicted" of a criminal offense; (2) an alien subject to deportation by virtue of a covered criminal conviction but who was never "incarcerated" for the underlying offense; (3) an aggravated felon who was not "lawfully admitted" into this country but who was released from criminal incarceration prior to April 24, 1996; (4) an alien deportable on multiple crimes involving moral turpitude, neither of which is predicated on section 241(a)(2)(A)(i) of the Act, and who was released from criminal incarceration before October 9, 1996; and (5) an alien deportable by reason of a qualifying conviction but who was not taken into custody "when released" from incarceration and was only later discovered by the Service.

The construction we adopt avoids these seemingly anomalous results and is in harmony with the statute as a whole and its legislative intent. *See United States v. Turkette*, 452 U.S. 576, 580 (1981) (noting that absurd results are to be avoided).

In sum, we conclude that the Transition Period Custody Rules extend to at least those custody determinations of currently detained deportable aliens whose deportation grounds are covered by the transition rule statute, regardless of the particular alien's date of release from criminal incarceration or whether the alien was ever subject to criminal incarceration.[9]

## B. Retroactivity Concerns Are Not Implicated When Applying New Standards to Aggravated Felons

We agree with amici that the application of the new custody standards to this respondent is not impermissibly retroactive in the sense the Supreme Court used that term. *See Landgraf v. USI Film Products, supra*. The transition rules of section 303(b)(3) of the IIRIRA speak in terms of our present authority to release a criminal alien from immigration detention. The statutory directive is that the "Attorney General may release" the described aliens provided specified conditions are satisfied. Current law normally governs when statutes "speak to the power of the court rather than to the rights or obligations of the parties." *Republic Nat'l Bank of Miami v. United States*, 506 U.S. 80, 100 (1992) (Thomas, J., concurring), *quoted with approval in Landgraf v. USI Film Products, supra*, at 274, in the context of jurisdictional provisions.

Neither the parties nor amici argue that the criminal alien or the Service has a vested right to the application of the mandatory detention requirement of the AEDPA to the alien's custody determination. But it would seem to require such a curious argument to find *Landgraf* retroactivity to be a concern in this context.

---

[9] The dissent's construction of the relevant statutory language does not extinguish the constitutional concerns it posits. Some aliens will fall within the purview of mandatory detention under either reading of the statutory language.

Amici also argues that retroactivity is not a concern because the respondent is in a better, or the same, situation than he would have been without the enactment of the new law. Under this argument, it is noted that the current version of the custody rules is, by any standards, more favorable to the respondent than the detention mandate in effect at the time of the Immigration Judge's decision. The current release standard of section 303(b)(3)(B)(i) of the IIRIRA also virtually mirrors that of the applicable standard in effect at the time of the respondent's 1993 conviction and initial 1994 bond determination.[10]

In view of the foregoing, we find that the Transition Period Custody Rules apply to our present determination of the respondent's eligibility for release.

## V. THE AUTHORITY TO RELEASE AGGRAVATED FELONS UNDER SECTION 303(b)(3)(B) OF THE IIRIRA

We next consider the question of whether an alien convicted of an aggravated felony is barred from release under the Transition Period Custody Rules. We find, in accord with the position of the Service and amici on appeal, that a plain reading of section 303(b)(3)(B) permits the release of an alien deportable as an aggravated felon, provided he or she can satisfy either subparagraph (A)(i) or (ii) of that section.

In the present case, the statutory language of section 303(b)(3)(B) declares that aliens described in subparagraph (A)(iii) are eligible for release. And aliens deportable based on an aggravated felony, such as the respondent, are included in subparagraph (A)(iii). Although there are some conflicting signals, we find that aliens deportable as aggravated felons may be released on bond because of the express language of the statute permitting such release, the absence of a clearly expressed legislative intent to the contrary, and the absence of any alternative readings suggested by the parties.[11]

Our only reservation with this interpretation relates to the overlapping coverage of aggravated felons in sections 303(b)(3)(A)(i) and (iii) of the IIRIRA. As noted in Part II, Congress did not expressly authorize the release

---

[10] We need not determine here whether amici's argument reflects a correct understanding of a retroactivity analysis under *Landgraf v. USI Film Products, supra. See generally Plaut v. Spendthrift Farm,* 514 U.S. 211, 237 (1995) (stating that a general "remedial" legislative purpose would not, in and of itself, defeat the presumption against retroactivity). We also do not address amici's contention that custody determinations of aliens with pre-AEDPA nonaggravated felony convictions are not governed by the Transition Period Custody Rules because applying those standards to them would violate retroactivity concerns.

[11] We note that the Service apparently recommended the current, or a similar version, of the transition rules eventually adopted by Congress. *See* INS General Counsel's statement, *supra*. And, the Service urges in its supplemental brief that aggravated felons are not barred from release under the Transition Period Custody Rules. Amici advances this interpretation as well. While the respondent did not address this issue on appeal, we find his assertions before the Immigration Judge consistent with this position.

of aliens listed in sections 303(b)(3)(A)(i) and (iv), and subparagraph (A)(i) consists of aliens convicted of aggravated felonies. The obvious inference is that Congress did not want aggravated felons released under the transition rules. But this inference directly conflicts with the specific language of the release provisions, which permit aliens deportable on aggravated felony grounds to be released under the conditions set forth in subparagraph (B) by section 303(b)(3) of the IIRIRA. The parties have not offered, nor have we identified, a sensible way of construing the statute so as to give effect to both the implicit inference derived from the absence of release authorization for aggravated felons described in subparagraph (A)(i) and the explicit authorization to release aggravated felons falling under subparagraph (A)(iii). In attempting to reconcile this apparent conflict, we have not found sufficient direct and specific evidence in the legislative history or statutory structure to justify disregarding the clear, expressed language authorizing the release of aliens deportable by reason of an aggravated felony.

We recognize that "only the most extraordinary showing of contrary intentions" would permit a limitation on the express statutory language. *Garcia v. United States*, 469 U.S. 70, 75 (1984). The relevant legislative history does not shed light on congressional views regarding aggravated felons' eligibility for release during the transition period. *See* H.R. Rep. No. 104-469(I) (1996); H.R. Rep. No. 104-828; H.R. Rep. No. 104-863.

We recognize that there is some support in the statutory structure for a reading of section 303(b)(3) that would prohibit release of an aggravated felon, an interpretation inconsistent with that urged by the parties on appeal. In this regard, we observe that the permanent custody rules in section 303(a) of the IIRIRA are structured similarly to the transition rules but do not contain the statutory overlap or repetition of the category of aggravated felons. This might suggest that congressional drafters created subparagraph (A)(i) in section 303(b)(3) of the transition rules with the intention of excluding aggravated felons from release, but failed to effectuate this intent because of a drafting error. It also appears in other sections of the IIRIRA that Congress was particularly concerned about the expeditious removal of aggravated felons from this country. *See, e.g.,* IIRIRA § 304, 110 Stat. at 3009-587 (stating that aggravated felons are not eligible for cancellation of removal relief); IIRIRA § 386, 110 Stat. at 3009-653 (requiring the Attorney General to estimate in a separate report to the House Judiciary Committee before April 1, 1997, the number of aggravated felons over past 3 years released from detention facilities or not taken into custody); *see also Detention and 212(c) Waivers For Criminal Aliens Provision of H.R. 2202,* 142 Cong. Rec. S12,294-01 (daily ed. Oct. 3, 1996).

Nonetheless, the Transition Period Custody Rules were evidently adopted by Congress for the specific purpose of addressing practical considerations in implementing a mandatory detention requirement. The bill, as it existed after the AEDPA's enactment, did not contain the transition rules, but rather

mandated the detention of criminal aliens. *See, e.g.*, 142 Cong. Rec. S4,730-01, § 164 (daily ed. May 6, 1996). Shortly before IIRIRA's enactment, however, the Service advised Congress that it did not have the capacity to implement the mandatory detention provision implemented by the AEDPA and that, until it did have the capacity, it recommended some discretion be restored in criminal custody cases so that limited detention space could be reserved for those criminals dangerous to the community and for noncriminal enforcement. *See* INS General Counsel's statement, *supra; see also* 142 Cong. Rec. S11,838-01, S11,839 (daily ed. Sept. 30, 1996) (Senator Hatch stating that, while he preferred legislation mandating detention of criminal aliens, he supported the transitional rules due to the Administration's urgings); 142 Cong. Rec. S11,872-01, S11,886 (daily ed. Sept. 30, 1996) (Sen. Abraham recognizing that the transition rules would give the Attorney General the authority to release "large categories" of criminal aliens pending deportation). As noted by amici, section 303(b)(2)'s express language evidences further that Congress enacted the transition rules in response to the Service's recommendations. *See* IIRIRA § 303(b)(2) (stating that the Attorney General may invoke the transition rules by certifying that "there is insufficient detention space and [Service] personnel available to carry out" the IIRIRA's permanent custody rules or section 440(c) of the AEDPA). Also as pointed out by amici, this legislative purpose would be significantly undermined if aggravated felons were barred from release, given the even larger number of criminal offenses now included in the aggravated felony definition.[12]

The import of this is that no clearly expressed legislative intention emerges as to the treatment of aggravated felons during the transition period. Consequently, any *inferences* to be drawn from the absence of release authorization as to "(A)(i)" aggravated felons are insufficient to override the literal language of the statute which permits the release of "(A)(iii)" aggravated felons under the limited terms of section 303(b)(3)(B).

---

[12] Section 321 of the IIRIRA, 110 Stat. at 3009-627, broadens the definition of "aggravated felony," even beyond the AEDPA amendments to that term, by adding the crimes of rape and sexual abuse of a minor; lowering the fine threshold for money laundering and certain monetary transactions from $100,000 to $10,000; decreasing the loss threshold for crimes of tax evasion and fraud and deceit from $200,000 to $10,000; changing the threshold of offenses relating to gambling, bribery, and perjury from a sentence of 5 years' confinement to 1 year's actual imprisonment; and decreasing the imprisonment threshold for theft, violence, racketeering, and document fraud from 5 to 1 years. This section also adds new offenses related to revealing the identity of undercover agents and transporting prostitutes. It deletes the requirement that a crime of alien smuggling be for commercial advantage in order to be considered an aggravated felony, but exempts the first offense involving solely the alien's spouse, child, or parent. In addition to the lower thresholds and added offenses, in section 321(b) of the IIRIRA, 110 Stat. at 3009-628, Congress eliminated all temporal limitations previously assigned to the aggravated felony definition.

We thus find aggravated felons are not barred from release under the transition rules. Given our understanding of the approach dictated by the Supreme Court with regard to statutory interpretation, we are not at liberty to rewrite the literal language of the statute permitting the release of aliens deportable based on an aggravated felony, and any changes to the express language must be left to Congress. *See, e.g., Hanover Bank v. Commissioner*, 369 U.S. 672 (1962).

## VI. CONCLUSION

In sum, we hold that the Transition Period Custody Rules of the IIRIRA govern the present custody determination of a detained deportable alien convicted of an aggravated felony. We also hold that this respondent, who is deportable based on an aggravated felony is eligible for release, provided he can satisfy sections 303(b)(3)(B)(i) or (ii) of the IIRIRA.

From the record before us, we are unable to determine whether the respondent can satisfy the statutory conditions regarding dangerousness and flight risk. These factors were evidently not explored at the bond redetermination hearing but, if they were, the Immigration Judge did not discuss them in his decision. We therefore will remand this case to the Immigration Judge to allow the respondent the opportunity to demonstrate that he "will not pose a danger to the safety of other persons or of property and is likely to appear for any scheduled proceeding" and for the setting of an appropriate bond if these showings are made. *See* IIRIRA § 303(b)(3)(B)(i).

On remand, the Immigration Judge should follow the approach set forth in our pre-AEDPA "aggravated felon" bond case law, absent persuasive reasons advanced by either party as to why that case law should not be deemed applicable under the transition rules. *See, e.g., Matter of Drysdale, supra.*

**ORDER:**   The record is remanded to the Immigration Judge for further proceedings consistent with the foregoing opinion.

*CONCURRING AND DISSENTING OPINION:* Lory D. Rosenberg, Board Member, in which Fred W. Vacca, and John W. Guendelsberger, Board Members, joined

I respectfully concur in part and dissent in part.

There is no question that the Transition Period Custody Rules ("transition rules") provided under section 303(b)(3) of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Division C of Pub. L. No. 104-208, 110 Stat. 3009-546, 3009-586 ("IIRIRA"), effective October 9, 1996, apply to the respondent. Although he was released from incarceration in May 1996, 5 months before section 303(b)(3) of the IIRIRA took effect, the statute now provides that, "instead of" being held in mandatory detention pursuant to section 440(c) of the Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-132, 110 Stat. 1214, 1277 ("AEDPA"),

effective April 24, 1996, the respondent is entitled to an individual hearing in which he will have an opportunity to demonstrate that he is eligible for release from detention by the Immigration and Naturalization Service.

I also agree with the majority's conclusion that the specific language of section 303(b)(3)(B) of the IIRIRA does not prohibit, but authorizes, the release of an alien such as the respondent who has been convicted of an aggravated felony described in section 303(b)(3)(A)(iii), provided he is otherwise qualified for release on bond. Consequently, I concur in the result reached by the majority.

However, that is not the end of the matter. In arriving at the conclusion that this respondent now may be considered for release from Service detention, we need to construe the recent statutory provisions which pertain to detention and custody. I differ from what I consider to be the majority's unsupported interpretation of the reach of the current statutory scheme.

The majority contends that neither the prospective language, "when the alien is released" in amended section 236(c) of the Immigration and Nationality Act (to be codified at 8 U.S.C. § 1226(c)) or section 303(b)(3)(A) of the IIRIRA, nor the prospective language "upon release from incarceration" in section 440(c) of the AEDPA, should be given a temporal or descriptive meaning in determining the category of criminal aliens covered by either of the amendments or the transitional rules. In essence, the majority claims that the effective date of the transition rules, October 9, 1996, is of no effect, just as apparently, they presume that the prior effective date of the AEDPA, April 24, 1996, is of no effect. I find no authority justifying our dismissal of the plain meaning of either the "release" language or the relevant effective dates, and I believe the majority's departure conflicts with longstanding canons of statutory interpretation as well as fundamental constitutional considerations.

## I. OVERVIEW

Congress most recently amended the provisions governing the apprehension and civil detention of certain criminal aliens who have been released from the incarceration portion of a criminal sentence and are inadmissible or deportable.[1] *See* IIRIRA § 303, 110 Stat. at 3009-585. In the case of these criminal aliens, redesignated sections 236(c)(1) and (2) of the Act mandate detention without any individual consideration for release unless such release is necessary to provide protection to a witness or a family member of a witness cooperating with an investigation into major criminal activity. IIRIRA § 303(a).

---

[1] For clarity's sake, I refer to the time spent in a penal institution pursuant to the incarceration portion of a criminal sentence levied under state or federal criminal laws as "incarceration" or "imprisonment," and the time spent in a penal institution pursuant to the Attorney General's civil authority under the Immigration and Nationality Act to arrest and detain aliens who are believed to be inadmissible or deportable as "detention" or "custody."

Despite an apparent desire to detain without the possibility of bond the vast majority of criminal aliens without distinguishing the offenses involved or providing any individual consideration of factors relevant to release, Congress recognized that practical considerations made that goal, as expressed in section 303(a) of the IIRIRA and in section 440(c) of the AEDPA, impossible to achieve immediately.[2] Therefore, Congress simultaneously enacted a provision allowing the Attorney General to give notice of the Service's need to delay implementation of these mandatory detention requirements and provided alternate terms for the apprehension and release from detention of covered criminal aliens, which shall be in effect "instead of" the mandatory provisions for an interim period following notification.[3] *See* IIRIRA §§ 303(b)(2), (3), 110 Stat. at 3009-586. Citing detention priorities and new statutory mandates requiring allocation of detention space and personnel, the Attorney General so notified Congress on October 9, 1996.

The Attorney General's notification is consistent with the position of the Service taken in congressional hearings on H.R. 2202, 104th Cong. (1996), the bill that ultimately resulted, after amendments, in the IIRIRA. *Criminal and Illegal Aliens, 1996: Hearings Before the Subcomm. on Immigration and Claims of the House Comm. on the Judiciary*, 104th Cong. (Sept. 5, 1996) (statement of David A. Martin, General Counsel, INS). As the General Counsel noted in his statement before the subcommittee, although detention of criminal aliens was a top priority of the administration, it was nonetheless crucial for the Attorney General to have discretion to release aliens who were convicted of crimes but who did not present any threat to the community.

The transition rules provide for a process of consideration for release from detention under standards not unlike those contained in section 242(a)(2)(B) of the Act, 8 U.S.C. § 1252(a)(2)(B) (1994), prior to its amendment by section 440(c) of the AEDPA. In particular, section 303(b)(3)(B)(i) of the IIRIRA provides that the Attorney General may release an alien who is lawfully admitted and who she is satisfied will not pose a threat to the safety of other persons or of property and is likely to appear for any scheduled proceeding.

Former section 242(a)(2)(B) provided that the Attorney General may not release an alien convicted of an aggravated felony, unless he demonstrates

---

[2] Both section 440(c) of the AEDPA and section 236(c) of the Act significantly expand the category of convicted aliens subject to incarceration who are to be taken into custody when released from the imprisonment portion of their criminal sentences and to be held without hearing or the possibility of bond. Compare former section 242(a)(2)(B) of the Act, 8 U.S.C. § 1252(a)(2)(B) (1994), discussed below, which referred only to those aliens convicted of an aggravated felony and then imposed only a presumption against release.

[3] The phrase "instead of" refers, as the majority takes care to emphasize, to provisions of law and not to persons. However, as discussed below, that is a distinction without a difference, since it is only those persons who come within the ambit of the language of either section 440(c) of the AEDPA, or section 236(c) of the Act who are subject to the terms of either provision.

that he has been lawfully admitted to the United States, does not present a threat to the community, and is likely to appear for any scheduled hearing. *Matter of Ellis*, 20 I&N Dec. 641, 643 (BIA 1993). The Board had construed section 242(a)(2)(B) as creating a presumption against release under which the Immigration Judge was to evaluate the factors relevant to a bond determination, including the nature and seriousness of the respondent's criminal record, his family ties, length of residence in the community, appearance record at court proceedings, rehabilitative efforts, and eligibility for relief from deportation. *See Matter of Drysdale*, 20 I&N Dec. 815, 817-18 (BIA 1994); *see also Matter of De La Cruz*, 20 I&N Dec. 346 (BIA 1991), *modified, Matter of Ellis, supra.*

The detention of a limited group of certain criminal aliens continues to be governed by section 242(a)(1) of the Act. These aliens are not covered by the mandatory detention provisions of section 236(c) of the IIRIRA or section 440(c) of the AEDPA and consequently are not subject to the standard provided under the transition rules.

Section 242(a)(1) authorizes the Attorney General to apprehend and take into custody any alien pending a determination of deportability. Under this section, the Service is expected to make an interim determination of the terms of release on bond pending a final determination of deportability. *See also* 8 C.F.R. § 242.2(c)(2)(1996). Section 242(a)(1) of the Act has been read to provide, and continues to provide, for a redetermination hearing before an Immigration Judge in which an evaluation of factors emphasizing national security and the risk of flight is paramount. *See Matter of Patel*, 15 I&N Dec. 666 (BIA 1976); *Matter of P-C-M-*, 20 I&N Dec. 432 (BIA 1991); *see also* 8 C.F.R. 242.2(d). Considerations that have long been relevant to bond determinations include the existence of a criminal record or the possibility of any threat to the community. *See Matter of Andrade*, 19 I&N Dec. 488, 489 (BIA 1987); *see also Matter of P-C-M-, supra; Matter of Kwun*, 13 I&N Dec. 457 (BIA 1969).

Access to a hearing under section 242(a)(1) of the Act does not mandate or guarantee release from custody. These aliens are still subject to being detained at the Service's discretion under the provisions of section 242(a)(1) of the Act.

## II. STATUTORY LANGUAGE AND CANONS OF CONSTRUCTION

The question before us is, following enactment of the IIRIRA and, specifically, of the transition rules which now govern release from detention for certain aliens during the interim period set by the Attorney General's notification, which aliens are covered by the transition rules? Put another way, when an alien presently seeking release from Service detention has been convicted of a crime, how do we now determine the applicable provision of law?

Our role in interpreting the terms of the transition custody rules, as in any other statutory construction, is to attempt to give effect to legislative intent. It is assumed that the legislative purpose is expressed by the ordinary meaning of the words used in the statute. *INS v. Cardoza-Fonseca*, 480 U.S. 421, 431 (1987); *INS v. Phinpathya,* 464 U.S. 183, 189 (1984); *Matter of Barrett,* 20 I&N Dec. 171 (1990). Thus, an examination of the language of both current and former provisions is critical in interpreting the provision before us.

If these statutory terms are plain and provide a clear expression of Congress' intent as to the provision's meaning, they must be given effect. *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 842-43 (1984). Where Congress' intent is not plainly expressed, or subject to an ordinary meaning, we are to determine a reasonable interpretation of the language that effectuates Congress' intent. *Id.* at 843.

In engaging in either such interpretation, we observe the established canons of statutory interpretation. *Cardoza-Fonseca v. INS, supra*, at 449. We are expected to give the words used their ordinary meaning. *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc., supra.* We are to construe the language in question in harmony with the thrust of related provisions and with the statute as a whole. *K Mart Corp. v. Cartier Inc.,* 486 U.S. 281, 291 (1988) (holding that construction of language which takes into account the design of the statute as a whole is preferred); *see also COIT Independence Joint Venture v. Federal Sav. and Loan Ins. Corp.,* 489 U.S. 561 (1989); *Matter of W-F-,* 21 I&N Dec. 516 (BIA 1996).

We are also required to construe the statute in a manner that does not render any term surplusage. *United States v. Menasche*, 348 U.S. 528 (1955). In addition, we must be mindful to give a restrictive meaning to a provision "if a broader meaning would generate constitutional doubts." *See United States v. Witkovich*, 353 U.S. 194, 199 (1957). Furthermore, in view of the harsh consequences of deportation, ambiguities are to be construed in favor of the alien. *Barber v. Gonzales*, 347 U.S. 637, 642 (1954); *Fong Haw Tan v. Phelan*, 333 U.S. 6, 10 (1948); *Matter of Hou*, 20 I&N Dec. 513, 520 (BIA 1992), *superseded on other grounds, Matter of Saint John*, 21 I&N Dec. 593 (BIA 1996); *Matter of Tiwari*, 19 I&N Dec. 875, 881 (BIA 1989).

## A. Statutory Language and Effective Dates of the Relevant Provisions

The provision of the IIRIRA under scrutiny, Section 303, is entitled "Apprehension and Detention of Aliens." It authorizes the arrest and detention of certain aliens pending a hearing to determine whether they are subject to deportation, and the circumstances, if any, under which they may be released from detention during that process. *See generally* section 236(a) of the Act, *as amended by* the IIRIRA. Section 236(c) of the Act, entitled "Detention of Criminal Aliens," authorizes arrest and detention without the

possibility of release, except where release may be necessary to protect a witness or family member cooperating with an investigation into major criminal activity. *As amended by* the IIRIRA, section 236(c)(1) provides:

> The Attorney General shall take into custody any alien . . . *when the alien is released*, without regard to whether the alien is released on parole, supervised release, or probation [or] may be arrested and imprisoned again for the same offense. (Emphasis added.)

These amendments take effect on April 1, 1997. Section 303(b)(1) of the IIRIRA; *see also* IIRIRA § 309(a), 110 Stat. at 3009-625. Until that time, barring any intervening enactment, section 440(c) of the AEDPA, effective April 24, 1996, was to govern the terms of custody and detention of most criminal aliens. Section 242(a)(2) of the Act, as amended by section 440(c) of the AEDPA, effective April 24, 1996,[4] provides:

> The Attorney General shall take into custody any alien convicted of any criminal offense covered [in specified deportation sections], *upon release of the alien from incarceration,* [and] shall deport the alien as expeditiously as possible.[5] Notwithstanding [certain unrelated provisions], the Attorney General *shall not release such felon from custody*. (Emphasis added.)

However, on October 9, 1996, the Attorney General invoked the Transition Period Custody Rules which the statute provides shall be in effect for a 1-year period, subject to a 1-year extension. *See* section 303(b)(3) of the IIRIRA.[6] The first subparagraph of the transition rules provides that during the period the rules are in effect, pursuant to section 303(b)(2), the Attorney General shall take into custody any alien who falls within one of four subsections describing criminal or security offenses when the alien is released from imprisonment for the underlying wrongdoing. In pertinent part section 303(b)(3)(A) provides:

> During the period in which this paragraph is in effect pursuant to paragraph (2), the Attorney General shall take into custody any alien who [has been convicted of an aggravated

---

[4] Section 440(c) of the AEDPA replaced section 242(a)(2) of the Act, enacted in the Immigration Act of 1990, Pub. L. No. 101-649, 104 Stat. 4978 (effective Nov. 29, 1990), and further amended by section 306(a)(4) of the Miscellaneous and Technical Immigration and Naturalization Amendments of 1991, Pub. L. No. 102-232, 105 Stat. 1733 ("MTINA"), which in pertinent part provides:

> The Attorney General shall take into custody any alien convicted of an aggravated felony *upon release of the alien* . . . but subject to subparagraph (B), the Attorney General *shall not release such felon from custody*. (Emphasis added.)

[5] Reading this section to place an apparently missing connector "and" after the "upon release" clause is consistent both with the previous wording and with legislative practice of describing events in normal sequence. *See generally Matter of Grinberg*, 20 I&N Dec. 911 (BIA 1994).

[6] Section 303(b)(2) of the IIRIRA provides that the transition rules may be invoked "[i]f the Attorney General . . . notifies in writing the Committees on the Judiciary of the House of Representatives and the Senate that there is insufficient detention space and . . . Service personnel available to carry out section 236(c) . . . or the amendments made by section 440(c) of Public Law 104-132."

felony, is inadmissible or deportable on specified criminal grounds, or is inadmissible on security grounds] *when the alien is released* . . . . (Emphasis added.)

Unlike section 236(c) of the Act, no specific date is provided as the date on which the transition rules, which now have been activated by the Attorney General, take effect. In the absence of a specific indication from Congress setting an alternative date, the effective date of legislation is the date of its enactment. *See, e.g., Matter of U-M-*, 20 I&N Dec. 327, 332 (BIA 1991), *aff'd,* 989 F.2d 1085 (9th Cir. 1993). Applying this principle to the detention provisions in the IIRIRA, I conclude that October 9, 1996, the date of the Attorney General's notification to Congress that an interim detention procedure is required, is the date on which the transition rules which now govern release from Service detention take effect. *See* IIRIRA § 303(b)(2).

Each successive generation of statutory section addressing the custody and detention of certain criminal aliens uses the language "when . . . released" or "upon release" in referring to the termination of penal imprisonment as a factor, combined with certain designated offenses, in describing those aliens who are covered by the statutory provision. It is these aliens who are to be taken into custody by the Attorney General and to whom the prohibition against or limitation on release from Service detention applies. This terminology has been included consistently in addition to an effective date and refers to the future event of release from incarceration occurring after the effective date. The language of the transition rules is no different, and the usage of the phrase "when released" in those rules should not be construed differently.

## B. Statutory Interpretation and Prospective Operation of Statutes

In analyzing the statute, the majority opinion erroneously dismisses the plain prospective language "*when the alien is released* [without regard to the form of release from the imprisonment imposed for his criminal offense]" in the transition rules. *See* IIRIRA § 303(b)(3)(A). Statutes affecting substantive rights or obligations as does this one are presumed to operate prospectively. *Bennett v. New Jersey,* 470 U.S. 632, 639 (1985). As the transition rules took effect on October 9, 1996, presumably they apply to events occurring after that date, such as release from incarceration, which trigger their application.

In addition, congressional enactments will not be read to have retroactive effect unless their language specifically requires this result. *Bowen v. Georgetown Univ. Hospital,* 488 U.S. 204, 208 (1988); *see also Landgraf v. USI Film Products*, 511 U.S. 244, 280 (1995).[7] Here, however, Congress has explicitly indicated an exception to the prospective application of the

_____

[7] For purposes of this opinion, I do not reach the question of the settled expectations which an alien taken into custody may have, or how those expectations are to be observed given the absence of an express declaration by Congress that the provision is to be given retroactive

transition rules applicable to a discrete number of cases which arose before October 9, 1996. Section 303(b)(2) of the IIRIRA, which has been triggered by the Attorney General's notification provides that the transition rules provided in 303(b)(3)

> shall be in effect for a 1-year period, beginning on the date of such notification [renewable for a subsequent year] . . . , *instead of* such section [section 236(c)] or such amendments [made by section 440(c) of the AEDPA] . . . . After the end of *such . . . periods*, the provisions of such section 236(c) *shall apply to individuals released after such periods*. (Emphasis added.)

Thus, section 303(b)(2) states clearly that the transition rule provision is in effect "instead of" section 440(c) of the AEDPA. As the law in effect only can be in effect as to those to whom its language applies, the transition rules must apply to those aliens who otherwise would be subject to the terms of section 440(c) of the AEDPA. In other words, despite the majority's protestations that it is not to whom the law applies, but which law applies, we agree that the statutory language "points powerfully toward a construction of the [transition rules] that reaches those . . . who were subject to the AEDPA provisions." *Matter of Noble,* 21 I&N Dec. 672, 679 (BIA 1996). Therefore, although the majority declines to address this question, it is imperative to determine which aliens would have been subject to section 440(c) of the AEDPA, in order to determine which aliens are subject to the transition rules.

The language of section 440(c) of the AEDPA is both mandatory and prospective. Congress's use of the word "shall" in the first sentence reflects that the Attorney General is required to take the aliens described in the first sentence into Service custody. The phrase "upon release" in the initial command implies a future occurrence in relation to the date of enactment or other effective date. As the AEDPA does not designate any other effective date for the provision, section 440(c)'s effective date is the date of its enactment, April 24, 1996, and its terms apply to events referenced in the provision that occur after that date.

Furthermore, the term "such felon" in the second sentence of section 440(c) refers to the aliens described in the first sentence, i.e., those taken into custody upon release from incarceration. *Black's Law Dictionary* defines the word "such" as: "Of that kind, having particular quality or character specified. Identical with, *being the same as what has been mentioned* . . . . [A] descriptive and relative word, referring to the last antecedent." *Black's Law Dictionary* 1284 (5th ed. 1979) (emphasis added). Thus, the qualities and characteristics of the aliens described relate both to the type of conviction and to the time of release from incarceration.

---

effect. *Landgraf v. USI Film Products*, 511 U.S. 244, at 278. I do, however, note my disagreement with the majority's citation to *Republic National Bank of Miami v. United States,* 506 U.S. 80, 100 (1992) (Thomas, J., concurring) as I find that citation inapposite to the present discussion, which addresses not a jurisdictional matter such as the power of the courts, but the substantive circumstances affecting detained alien's ability to apply for and be granted release.

A prospective reading of detention provisions and their effective dates which affect the treatment of certain criminal aliens is not revolutionary. In fact, in recent prior enactments restricting an alien's eligibility for release from custody, a prospective application has been the rule. *See* former section 242(a)(2) of the Act as amended,[8] which provided specifically that the terms of that provision applied only to aggravated felony convictions occurring on or after the effective date of that limitation. *See Matter of A-A-*, 20 I & N 492, 497 (BIA 1992) (emphasizing that when Congress desired to limit the reach of a given provision it did so expressly); *Matter of De La Cruz, supra* (involving the application of a restrictive custody provision effective in 1988 to an alien convicted on October 3, 1989); *see also Cuomo v. Barr,* 812 F. Supp. 324, 330 (N.D.N.Y. 1993); "Aggravated Felony: Applicability to Convictions prior to November 18, 1988," Op. Off. Gen. Counsel 3 (Feb. 22, 1991) (concluding that ADAA section 7343 applies "only to those aliens 'convicted' of an aggravated felony on or after November 18, 1988. The final conviction itself triggers the mandatory detention . . . .").

## III. APPLICABILITY OF THE TRANSITION RULES

The establishment of October 9, 1996, as an effective date, and the inclusion of persons subject to section 440(c) of the AEDPA, does not completely define the reach of section 303(b)(2) of the IIRIRA or indicate the category of cases to which the terms of section 303(b)(3) apply. Instead, we must rely on the statutory language of the transition rule itself to further define the applicability of the provision.

Our construction of sections 303(b)(2) and (3) must take into account the specific language used by Congress which indicates the general reach of the transition rules extends to an alien "when the alien is released" after October 9, 1996. Although the majority concedes that the language we interpret here is plain and contends that their reading comports with the language of the statute, *Matter of Noble, supra,* at 676, I cannot conclude that the majority abides by the plain language of either section 303(b) of the IIRIRA or section 440(c) of the AEDPA in their opinion.

The majority resists reading the key phrase "when released" as having any significance in determining the category of aliens who are subject to the provisions. Instead, the majority dismisses this language as having no bearing on the applicability of the transition rules other than to alert the Attorney General as to when her responsibilities under the rules arise, and simply extends the transitional rules to all criminal aliens.

---

[8] Enacted pursuant to section 7343 of the Anti-Drug Abuse Act of 1988, Pub. L. No. 100-690, 102 Stat. 4181, 4470 ("ADAA"), *revised by* section 504(a) of the Immigration Act of 1990, 104 Stat. at 5049-50 (Nov. 29, 1990), *corrected by* section 306 of the MTINA, 105 Stat. at 1751.

Furthermore, in addition to ignoring the plain language, the majority resorts to its own presumption of congressional intent and interjects a meaning not found in the text. However attractive, such a construction simply is not supported by the language of the statute we are to administer. It impermissibly renders not one, but three parts of section 303 of the IIRIRA meaningless, in violation of the canon that no statutory language should be rendered surplusage. *See* IIRIRA §§ 303(a), (b)(2), (3); *United States v. Menasche, supra,* at 538-39 (emphasizing that principles of statutory construction require that courts "give effect, if possible, to every clause and word of a statute"). It also violates this canon with regard to the language of section 440(c) of the AEDPA. *Id.*

## A. Consideration of "when the alien is released" Language

The phrase "when the alien is released" appears twice in section 303 of the IIRIRA. It first is used to describe criminal aliens to be detained under the section enacted to permanently govern detention, section 236(c)(1) of the Act. *See* IIRIRA § 303(a). The language of section 303(b)(3) is nearly identical. It is also used to describe criminal aliens who will be eligible for release from Service custody under the transition rules. The aliens subject to the transition rules are the ones convicted of the offenses described who are taken into custody by the Attorney General when they are released, or upon their release, from the imprisonment portion of their criminal sentences. IIRIRA § 303(b)(3)(B).[9]

This language cannot be dismissed, as the majority would prefer, as no more than a command to the Attorney General regarding when to go to a penal institution and assume custody of an alien. "When the alien is released" and "upon release from incarceration" are straightforward phrases having a common sense meaning in ordinary usage. *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc., supra.* Each is part of a subparagraph describing those aliens covered by the applicable detention provisions.

Congress is presumed to act deliberately with respect to the words it chooses. *INS v. Cardoza-Fonseca, supra.* Similarly, we are to give those words their ordinary meaning, in context, to give meaning to the statute overall. *Moskal v. United States*, 498 U.S. 103, 108-109 (1990). The strained construction posited by the majority actually ignores a reading of section 303(b) in its entirety, contrary to the canons which emphasize that interpretation of any one statutory provision must take into account the design and language of the statute as a whole. *See K Mart Corp. v. Cartier Inc., supra.*

---

[9] As discussed above, in addition to an alien taken into custody by the Attorney General after October 9, 1996, "when the alien is released" from criminal incarceration, those aliens taken into custody by the Attorney General "upon release from incarceration" prior to October 9, 1996, who would have been subject to section 440(c) of the AEDPA, also are subject to apprehension and detention under the transition rules.

There can be no question but that the phrase "when the alien is released" from the incarceration portion of his or her criminal sentence is a descriptive one which is an integral part of the statute with substantive meaning. It is part of a subparagraph of section 303(b)(3) which uses prospective language to describe which aliens are the ones whom the Attorney General shall take into custody and hold in detention subject to either the permanent statute or to the transition rules. In addition, the procedure contained in section 303(b)(2), calling for application of the permanent rules to those "*released after* [closure of the transitional] periods" makes clear that these detention provisions, uniformly, are prospective in effect.

Such language does not authorize detention subject to the terms of the permanent statute or the transition rules in the cases of those aliens apprehended at some time other than "when the alien is released" from the incarceration portion of their criminal sentence. The ones to be taken into custody and held subject to the release provisions under consideration are those criminal aliens who were imprisoned for offenses described in subparagraph (A) who now are being released from that incarceration.

In addressing the limited circumstances in which the Attorney General may consider release under the permanent provision found in section 236(c) of the Act, the statute refers expressly to an alien subject to the terms of paragraph (1) (in which the "when released" language is contained) as an "alien *described*" in that section. *See* section 236(c)(2) of the Act. This phrase makes clear that the "when the alien is released" language of section 236(c)(1) is a modifying phrase which is part of the description of the category of aliens who are subject to the provision. *See* IIRIRA § 303(a). Therefore, it is not reasonable to conclude, as does the majority, that usage of the phrase in the transition rules is no more than a direction to the Attorney General as to when her duty to take such aliens into custody arises.

Moreover, the language contained in section 303(b)(2) of the IIRIRA sets that proposition to rest by stating plainly that after the transition period ends, section 236(c) shall apply to individuals "released after such periods." The statute does not say that section 236(c) shall apply to any criminal alien without regard to the date of release from incarceration. It states that the mandatory detention provisions found in section 236(c) shall apply to those *released from incarceration* within the criminal justice system *after* the transition rules end, emphasizing that the aliens who will be covered by the detention provisions that take effect at that time are only those who are subsequently released from incarceration.

The post-transition instruction in section 303(b)(2) of the IIRIRA concerning the applicability of section 236(c) of the Act to criminal aliens released from incarceration after the transition period expires, makes clear that the "when released" language both in amended section 236(c) and in the transition rule provision, section 303(b)(3)(A), should be given meaning as a descriptive phrase partially defining the category of criminal aliens subject to

whatever provision is in force. This is not only consistent with a plain language reading of the phrase in the transition rule as one descriptive of which aliens are covered, but makes for a harmonious reading of the statute. *COIT Independence Joint Venture v. Federal Sav. and Loan Ins. Corp., supra; K Mart Corp. v. Cartier Inc., supra.* It also is consistent with congressional intent that dangerous aliens, already determined by the criminal justice system to require incarceration, not be released into society, but taken into custody by the Attorney General and detained.

## B. Consideration of Congressional Intent

The majority contends that since Congress directed that criminal aliens who pose a threat to the safety of persons or of property not be released into the community, it would not be consistent with prior legislative expressions to construe the transition rules in a way that permits aliens who were not taken into custody upon their release from imprisonment after either the October 9, 1996, or April 24, 1996, effective dates to be considered for release under a more lenient standard. However, an estimation of what Congress must have meant cannot substitute for the plain language of the statute or a rational reading of its terms.

There is no dispute that Congress was concerned with the detention of criminal aliens. However, to the extent that any statements in the legislative history directly conflict with the unambiguous meaning of the statute, the statute must prevail. *See United States Dep't. of Treasury v. Fabe*, 508 U.S. 491, 506-07 (1993) (rejecting a petitioner's citation to a single statement in a House report because it was "at odds" with the statute's plain language); *Helvering v. City Bank Farmer Trust Co.*, 296 U.S. 85, 89 (1935) (commenting that the Court is not at liberty to refer to committee reports where there can be no doubt of the meaning of the statutory language); *see also Gooding v. United States*, 416 U.S. 430, 468 (1974) (Marshall J., dissenting) (recognizing that it is the language of the statute which controls, not the language of the committee report which may or may not express accurately the views of those who voted for the bill).

As the majority so aptly points out, *Matter of Noble, supra*, at 682, (albeit in a different section of their opinion), only the most extraordinary showing of congressional intent, not presented here, is enough to limit the express language of statute. *See Garcia v. United States* 469 U.S. 70 (1984); *see also Kofa v. United States INS*, 60 F.3d 1084, 1088 (4th Cir. 1995) (noting that to look at legislative history before the language of the statute "would assume that Congress does not express its intent in the words of statutes, but only by way of legislative history, an idea that hopefully all will find unpalatable"). Had Congress intended to bring within the sweep of the mandatory "no release from custody" provision those who had been released from incarceration prior to the effective date, it could have done so easily by stating in clear

language that applied "notwithstanding the date of release of the alien from incarceration."

Furthermore, although the majority cites authority for the proposition that absurd results are to be avoided, *Matter of Noble, supra*, at 680, the majority does not and cannot claim that the interpretation posited here, based on a straightforward reading of the statutory language, leads to such an outcome. Certainly, keeping criminal aliens who pose a threat to the community in detention, subject to prompt removal, rather than returning them to the streets, is a reasonable and an understandable objective. However, if taking these aliens into custody upon their release from incarceration, as the current language requires, allows them a hearing under a standard which does not adequately achieve this objective, glossing over language in the statute is not the means to secure such a goal.

Even more regrettable than its unsubstantiated allusion to absurdity is the majority's apparent resort to an alarmist appeal, which suggests that an interpretation other than the one it proposes would lead to the "anomalous" result of causing dangerous aliens to be released into our communities. This is not only an insufficient reason for ignoring the plain statutory language, it simply is untrue.

First, the imprisonment of certain aliens determined to require incarceration by the criminal justice system is not devoid of significance. These are individuals who, by virtue of the nature of either the immediate offense involved or the criminal history which triggers their imprisonment, have been assessed to require removal from our streets. It is manifestly reasonable that we read the terms of the statute to impose a higher standard for release from Service detention upon an alien who is both convicted of, and incarcerated for, certain crimes than we apply to one who is convicted but has not been incarcerated. This distinction is rationally based on the judgement of other law enforcement authorities who have taken into account the nature of the criminal activity involved.

Second, applying section 242(a)(1) of the Act to some a criminal alien who is not subject to the transition rules does not mean that such an alien will be released into the community if we determine that he poses a threat to our communities. Section 242(a)(1) does not mandate release or limit meaningfully our power to detain. The applicant for release must establish his eligibility to the satisfaction of the Attorney General. The difference between this section and the terms of section 303(b)(3)(B) of the IIRIRA is only the absence of what we have treated as a presumption of dangerousness, not the consideration of dangerousness.

In particular, under the standard of section 242(a)(1), which presumes eligibility for release, this Board has been perfectly capable of ordering criminal aliens who pose a threat to our communities to be held in or returned to Service detention, or to be released only under a significant bond. For example, in *Matter of Shaw*, 15 I&N Dec. 794 (BIA 1976), decided 20 years ago, we

cited the complete lack of information regarding community ties, coupled with an undocumented entry and pending criminal possession of firearms charges, as warranting dismissal of an appeal of a $10,000 bond. In *Matter of Andrade, supra*, decided in 1987, we recognized that despite a record of long residence and family ties for much of the 12-year period prior to the respondent's arrest by the Service, he had been involved in criminal activity involving attempted robbery and other theft of property, and we imposed a $10,000 bond.

More recently, in *Matter of Kalifah*, 21 I&N Dec. 107 (BIA 1995), where no conviction or incarceration of any sort was involved at all, we readily invoked the flight risk factor under section 242(a)(1) of the Act, to agree with the Immigration Judge in concluding that an alien, who was charged with a serious crime involving terrorism abroad, was best held without any bond at all. Most importantly, we should acknowledge that we have long upheld the authority of the Service to revoke or redetermine a bond or terms of release when circumstances involving a threat to the community comes to light even after the Immigration Judge or the Board has rendered a decision. In *Matter of Sugay*, 17 I&N Dec. 637 (BIA 1981), we noted explicitly that in addition to the respondent's prior conviction for murder, information later elicited at the respondent's deportation hearing involving his arrest for brandishing a knife warranted the revocation of the original bond which had been required to secure the respondent's release.

Finally, the majority acknowledges that the express purpose of the transition rules was to address "practical considerations." *Matter of Noble, supra,* at 681. Yet the interpretation advanced by the majority would increase, not decrease, the number of criminal aliens whom the Service would be required to detain, because the Service now and in the future would be required to detain every person who was convicted of a designated offense without regard to either the factor of imprisonment or its assumption of custody upon release from incarceration. Neither the wisdom of the sentencing distinctions drawn within our criminal justice system nor the expression of Congress' concerns as expressed in the statutory language of section 303 of the IIRIRA warrants such a result.

## IV. CONSTITUTIONAL CONSIDERATIONS

It is critical that we define the actual reach of the terms of the transition rules true to the language of the statute. While in this case the construction of that language may be of inconsequential effect, that cannot be said either for an individual released from incarceration before April 24, 1996, or for an individual released from imprisonment after April 24, 1996, but before October 9, 1996, who was not subject to section 440(c) of the AEDPA. Although these individuals would be required, under section 242(a)(1) of the Act, to provide evidence favoring release on bond, including evidence that they are

neither a danger to national security nor a flight risk, as discussed in *Matter of Patel, supra*, and other Board precedent addressing past or potential criminal conduct, they would not be required to overcome a presumption that they pose a threat to the community.

Such a prudent reading is of even greater consequence in the case of an individual who is released after October 9, 1996, and before expiration of the effective period of the transition rules, whose eligibility for release from Service detention may be extinguished entirely following the expiration of these rules. Under section 236(c) of the Act, such an individual would be provided no hearing whatsoever, as the statute would mandate the Attorney General to maintain the person in custody.

To the extent that the language creates any ambiguity in the applicability of the transition rules, or the scope of section 440(c) of the AEDPA as subsumed within it, the principles of construction militate in favor of adopting the more narrow reading of the "when released" language. As noted above, when faced with a choice between two readings of a deportation provision, the courts and this Board have relied upon the sound principle that we resolve doubts in statutory construction in favor of the alien. *Cardoza-Fonseca v. INS, supra; Fong Haw Tan v. Phelan, supra; Matter of Tiwari, supra*.

The liberty interests implicated in the context of the release provisions of either the transition rules, which impose a stricter presumption of detention for some, or in the context of section 236(c), which mandates detention and forecloses an individual hearing for many, underscore the need for a narrow reading of the statutory restrictions. *See generally United States v. Himler,* 797 F.2d 156, 158 (3d Cir. 1986). (interpreting language narrowly where 1984 Bail Reform Act marked a "radical departure" from former federal bail policy). As the Supreme Court has stated, "[S]ince the stakes are considerable for the individual, we will not assume that Congress meant to trench on his freedom beyond that which is required by the narrowest of several possible meanings of the words used." *Fong Haw Tan v. Phelan, supra*, at 10.

The same rule of construction applies to ambiguous criminal statutes due to the severity of sanctions imposing a loss of liberty. *United States v. Bass,* 404 U.S. 336, 347 (1971). While deportation proceedings are characterized as civil rather than criminal, the liberty interest at stake for an alien, generally requiring the minimum due process protection of an individual hearing, is paramount in the detention and custody context. *Addington v. Texas*, 441 U.S. 418, 425 (1979) (holding that "[c]ivil commitment for any purpose constitutes a significant deprivation of liberty that requires due process protection"); *see also Mathews v. Eldridge,* 424 U.S. 319 (1976); *Kellman v. District Director, United States INS,* 750 F.Supp. 625 (S.D.N.Y. 1990) (recognizing that the liberty interest in deportation context is an issue of constitutional proportion); *Leader v. Blackman*, 744 F. Supp. 500, 503 (S.D.N.Y. 1990) (same).

The federal district courts, in addressing section 440(c) of the AEDPA, have recognized the importance of the liberty interest involved when an alien is denied an individualized hearing on his or her eligibility for release on bond. *See United States v. Igbonwa*, No. Crim.A. 90-375-1, 1996 WL 694178 (E.D. Pa. Dec. 2, 1996) (expressing reservations about applying mandatory detention provision which would burden a liberty interest in light of strong presumption against retroactive application); *Flanigan v. Reno*, 96-6179-WJR(E), slip op. at 1 (C.D. Cal. Oct. 1, 1996) (finding AEDPA mandatory detention provision unconstitutional and ordering bond hearing); *Villagomez v. Smith, available in* 1996 WL 622451, C96-1141C, slip op. at 4-5 (W.D. Wash. July 31, 1996) (granting TRO, and noting that acceptance of the INS' interpretation of AEDPA would raise serious constitutional issues); *Demelo v. Cobb*, 936 F. Supp. 30, 32 (D.Mass. 1996) (noting "serious due process issues" involved when a long-term resident alien is barred from consideration for release on bond, and construing the statute to avoid the constitutional issues). *In re Hernandez-Reyes*, B-94-80, slip op. at 4 (S.D. Tex. Mar. 31, 1996) (recognizing, in granting petitioner's release from custody, petitioner's "strong arguments . . . of principles of due process and fundamental fairness").

While we may not decide the constitutionality of a statute, we do have the duty to render our decisions in a manner that will avoid constitutional questions. *Matter of U-M-, supra; Matter of Cenatice*, 16 I&N Dec. 162 (BIA 1977); *see also Lyng v. Northwest Indian Cemetery Protective Ass'n*, 485 U.S. 439, 445-46, (1988); *United States v. Witkovich, supra*, at 199 (holding that the Board should construe a statute so as to not render it unconstitutional).

The overwhelming majority of district courts that considered mandatory immigration detention statutes, prior to this most recent enactment, have found them unconstitutional. *See, e.g., Kellman v. District Director, United States INS, supra; Paxton v. United States INS*, 745 F. Supp. 1261 (E.D. Mich. 1990), *aff'd on other grounds*, 954 F.2d 1253 (6th Cir. 1992); *Agunobi v. Thornburgh*, 745 F. Supp. 533 (N.D. Ill. 1990); *Leader v. Blackman, supra*.[10] In particular, such statutes were found to violate the constitutional guarantees of substantive and procedural due process, and the prohibition against excessive bail. *See also Thomas v. McElroy, available in* 1996 WL 487953, 96 Civ. 5065 (JSM) (S.D.N.Y. Aug. 23, 1996); *St. John v. McElroy*, 917 F. Supp. 243 (S.D.N.Y. 1996) (finding mandatory detention of lawful permanent residents under former section 236(e) of the Act unconstitutional); *Cabellero v. Caplinger*, 95-3129 (E.D. La. Feb. 6, 1996) (finding section 242(a)(2) unconstitutional as applied to an alien convicted of an aggravated felony who was not lawfully admitted).

---

[10] These cases involved an earlier version of section 242(a)(2) of the Act, which required the mandatory detention of any alien convicted of an aggravated felony. *See supra* note 4.

The majority erroneously ignores the constitutional issues implicated by their reading of the statute. Given the serious constitutional questions raised by the absolute deprivation of any hearing or individual consideration, the more prudent course is to read the statute as narrowly as possible. If a reviewing court were inclined to sanction a mandatory detention provision at all, it is far more likely that the court would do so only where the terms of the statute were construed as conservatively as possible to adversely burden the liberty of the fewest individuals.

## V. CONCLUSION

The transition rules provision is a prospective one with the express exception of the substitution for section 440(c) of the AEDPA, which also is prospective in its application. In enacting the present statute, Congress was quite specific that it intended the mandatory detention provision of section 236(c) of the Act to go into effect in the cases of those aliens released from incarceration *after* completion of the transition rules. IIRIRA § 303(b)(2). There is no indication that this provision was intended to have universal application without regard to the plain terms of its limiting temporal language. Congress' use of similar phraseology in referring to aliens taken into custody when the alien is released from incarceration during the period governed by the transition rules should be read no differently.

We should adhere to a common sense construction of the "when released" language that incorporates both the temporal factor of the time the alien is released from incarceration and designated in section 303(b)(3)(A) of the IIRIRA as part of the categorical description of the aliens not to be released from Service detention or released only subject to rebuttal of a presumption against release. It is a reasonable and sensible construction of the plain statutory language and comports at the same time with the canon that ambiguity in deportation provisions should be interpreted in favor of the alien.

Consequently, I dissent from the majority's refusal to afford a descriptive meaning to the "when released" language, which I find to be plain, both on its face and in the context of the statute as a whole, in favor of a more encompassing construction of the transition rules. Given the language and context of the statute, and the liberty interests at stake, I cannot agree that the statute, as written, either requires or supports such a result.